IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| JASMINE P., | ) | |
| Plaintiff, | ) | Civil Action No. 3:22-cv-00038 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:    Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Jasmine P. asks this Court to review the Acting Commissioner of Social

Security's ("Commissioner") final decision denying her applications for disability insurance

benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434, and for

supplemental security income ("SSI") under Title XVI of the Social Security Act, *id.* §§ 1381–

1385. Having considered the administrative record, the parties' briefs, and the applicable law, I

cannot find that the Commissioner's final decision is supported by substantial evidence.

Accordingly, I respectfully recommend that the presiding District Judge reverse the decision and

remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th

1

Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity ("RFC"); and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v.*

*Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[1] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Jasmine filed for DIB and SSI in April 2020. *See* Administrative Record ("R.") 222–33. Jasmine alleged that she became disabled on October 29, 2019, because of low, blurry vision; depression; convulsions; seizures; panic attacks; memory loss; staring spells; tremors; and insomnia. R. 255. Jasmine was twenty-nine years old on her alleged onset date, R. 261, making her a "younger person" under the regulations, 20 C.F.R. §§ 404.1563(c), 416.963(c). Disability Determination Services ("DDS"), the state agency, denied Jasmine's claims initially on March 1, 2021, R. 68–91, and upon reconsideration on May 3, 2021, R. 94–104. On October 1, 2021, Jasmine appeared with counsel and testified at an administrative hearing before ALJ Brian Rippel. *See* R. 39–65. A vocational expert ("VE") also testified at the hearing. R. 17, 59–64.

ALJ Rippel issued an unfavorable decision on October 18, 2021. R. 17–31. At step one, he found that Jasmine had not engaged in substantial gainful activity since October 29, 2019. R. 19–20. At step two, ALJ Rippel found that Jasmine had severe medically determinable impairments ("MDIs") of "migraine headaches, epilepsy, anxiety disorder, depressive disorder, and neurocognitive disorder." R. 20. At step three, ALJ Rippel found that Jasmine's severe impairments did not meet or medically equal the relevant Listings. R. 20–22 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 11.02, 12.02, 12.04, 12.06). As part of his Listings analysis, ALJ Rippel found that Jasmine's severe mental MDIs caused "a moderate limitation" in her broad functional

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the Commissioner's final written decision.

capacities for understanding, remembering, or applying information; for interacting with others;

for concentrating, persisting, or maintaining pace; and for adapting and managing herself. R. 21.

Next, ALJ Rippel determined that Jasmine had the residual functional capacity ("RFC")

to do "light work"[2] with additional restrictions of

> only occasional balancing[,] . . . climbing ramps or stairs, stooping, kneeling,
> crouching, [or] crawling; no exposure to workplace hazards (including unprotected
> heights and dangerous machinery--this precludes climbing ladders, ropes, or
> scaffolds as well); duties must not require operating motor vehicles or similar
> moving equipment like tractors or forklifts; limited to work in a setting no louder
> than a moderate noise environment . . .; limited to simple, routine tasks in entry-
> level, unskilled work with instructions that are not involved; while [Jasmine] can
> sustain concentration and persistence for 2-hour segments, the job must include
> routine, customary breaks after about 2-hour periods of work; no fast-paced
> production rate (defined as a setting in which a rapid pace of work is set by a
> conveyor belt or other similar external source, as well as rapid assembly line work
> where co-workers are side-by-side and the work of one affects the work of the
> other); limited to low-stress work (defined as involving only occasional
> independent decision making and/or changes in the work setting); and, requiring
> only occasional interaction with the public, coworkers, and/or supervisors; as to
> coworkers, only occasional tandem tasks.

R. 22. This RFC precluded Jasmine from returning to her past relevant work as a

corrections officer. R. 29. Based on the VE's testimony, however, ALJ Rippel found that

a hypothetical worker with this RFC and Jasmine's vocational profile could perform

certain unskilled "light" occupations (maid, office helper, and non-government mail

sorter) that offered a significant number of jobs in the national economy. R. 30–31 (citing

R. 60–62). Accordingly, ALJ Rippel found that Jasmine was not disabled during the

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these
strength demands can perform "[t]he full range of light work" only if he or she can also "stand or walk for
up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg
controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010)
(quoting 20 C.F.R. § 404.1567(b)); *see* SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983). ALJ Rippel
found that Jasmine could meet all of these requirements. R. 22.

4

relevant period. R. 31. The Appeals Council denied Jasmine's request to review the

ALJ's decision, R. 1–3, and this appeal followed.

### III. Discussion

Jasmine challenges the Commissioner's denial of benefits on the ground that ALJ

Rippel's "RFC [wa]s unsupported by substantial evidence as he failed to properly evaluate the

opinion of treating medical source Derek Pyland, M.D." Pl.'s Br. 9, ECF No. 17. Dr. Pyland

opined that Jasmine's symptoms were "frequently" severe enough to interfere with the attention

and concentration necessary to perform simple work-related tasks; she would need to take

additional breaks in excess of those normally allotted and miss work once or twice a month; and

she was limited in her abilities to walk, sit, stand, lift, grasp, twist, turn, reach, and do fine

manipulation. R. 705–06. These limitations would conflict with the VE's testimony that a person

needing additional breaks, absences, or off-task time would not be able to "keep any of the

sample jobs without being fired." *See* R. 63.

A.    *Summary*

1.    *Treatment Records*

On October 29, 2019, Jasmine lost consciousness while driving her car. R. 399. She

regained consciousness "up the road in a different parking lot" as Emergency Medical Services

("EMS") pulled her from her car; EMS took her to the emergency room for a possible seizure

while driving. R. 385, 399. Jasmine had no history of seizures, R. 385, but she had "woke[n] up a

few times in the past year" with the sides of her tongue "bloodied and . . . 'chewed up,'" R. 399.

Upon examination at the emergency room, Jasmine had multiple lacerations on her

tongue, normal deep tendon reflexes, intact sensation to light touch, and she was alert and

oriented times three. R. 387. A CT scan showed a trace subarachnoid hemorrhage along the left

anterior frontal lobe of her brain, but no acute intracranial abnormalities or vascular

abnormalities. R. 388. An MRI showed "[s]ubtle left frontal sulcal FLAIR hyperintensity"

corresponding to the "hyperdensity" on the CT scan, which may have been consistent with CT

scan finding of a small subarachnoid hemorrhage. R. 425. The MRI also showed

"[e]ncephalomalacia and gliosis suggestive of remote traumatic injury of the left temporal lobe,

which could potentially be a cause of seizure."[3] *Id.* While in the emergency room, Jasmine had a

generalized tonic clonic seizure that lasted three to five minutes and ended spontaneously, during

which she bit her tongue. R. 389. The attending physician gave her Keppra and kept her

overnight for observation. *Id.* The next day, Jasmine was alert and oriented times three and had

normal muscle bulk and tone; 5/5 strength throughout; and intact attention, memory,

comprehension, naming, and repetition. R. 392. Emergency room personnel discharged her with

a Keppra prescription, a November appointment for an EEG, a primary diagnosis of focal seizure

with secondary generalization, and secondary diagnoses of body aches and tongue pain. R. 399–

400.

On November 21, Jasmine established care with a primary care provider. R. 380. On

examination, Jasmine was alert and oriented times three and had normal mood, affect, and

behavior. R. 381. She reported that she had not had another seizure since starting Keppra and

was not depressed, but the medication made her drowsy and "slowed [her] cognition/memory."

*Id.* The same day, Jasmine had an EEG with normal results. R. 382–83.

In December, Jasmine told her doctor that her anxiety had increased, so her doctor

switched her medication from Keppra to Topamax. R. 378. On January 15, 2020, Jasmine visited

---

[3] Encephalomalacia is "softening of the brain." *Encephalomalacia*, Dorland's Illustrated Medical
Dictionary (32d ed. 2012). Gliosis is "an excess of astroglia in damaged areas of the nervous system."
*Gliosis*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

her primary care provider because her anxiety had worsened. R. 375. At that appointment, she was downcast and made intermittent eye contact. R. 376. The provider assessed Jasmine with anxiety and recommended counseling, which she declined. *Id.* The next day, the provider prescribed Hydroxyzine for Jasmine's anxiety. R. 374. Hydroxyzine helped Jasmine's anxiety, but she found that smoking marijuana also helped, so she stopped taking Hydroxyzine and started smoking marijuana instead. R. 373. In February, Jasmine visited her primary care provider for her anxiety. R. 372. Jasmine denied dizziness, seizures, or lightheadedness; was alert and oriented times three; and had normal mood, affect, and behavior. R. 373. The provider diagnosed Jasmine with panic attacks and recommended that she start taking Hydroxyzine again instead of smoking marijuana. *Id.*

On March 8, Jasmine went to the emergency room for anxiety, chest pain, shortness of breath, and nausea. R. 368–69. She was alert and oriented times three, was conversant, and had an anxious affect. R. 371. Jasmine's workup was unremarkable, and ER personnel discharged her with a psychiatry referral. R. 372. The next day, Jasmine had a follow-up appointment with her primary care provider. R. 365. At that appointment, Jasmine was calm, anxious, and interactive, and she had a steady gait, fluid speech, and linear thought processes. R. 367–68. The provider recommended counseling and prescribed Celexa for anxiety in addition to Hydroxyzine. R. 368.

On April 17, Jasmine had a telemedicine appointment with a neurology resident, Rebekka Hooks, M.D. R. 353. Jasmine was alert and oriented times three, and she had a full fund of knowledge and good understanding of her medical situation; intact attention; flat affect and dysphoric mood; and intact comprehension, naming, and repetition. R. 357. She was compliant with her Topamax prescription and "report[ed] no further episodes of 'blacking out, tongue

biting, convulsions[,] and/or unresponsive episodes since October 2019." R. 354. She also reported that her energy level and concentration had decreased, she often "zone[d] out" while people were talking, her long-term memory and recall were worse, she "sometimes ha[d] bifrontal tension-like headaches," and she had difficulty finding words. R. 354–55. Dr. Hooks reviewed imaging from October 2019 and found it "suggestive of underlying epilepsy." R. 358. She also noted that Jasmine had a normal EEG in November 2019. *Id.* She assessed Jasmine with focal epilepsy and anxiety. R. 358. Dr. Hooks noted that Jasmine's Topamax prescription was "below the recommended daily seizure dosage" and that Jasmine "would benefit from a more therapeutic regimen immediately." *Id.* Dr. Hooks also noted that "[i]ntolerance due to cognitive side effects [is] highly reported in patient[]s taking Topamax." *Id.* As such, Dr. Hooks changed Jasmine's anti-epileptic medication from Topamax to Oxtellar. *Id.* She recommended counseling for Jasmine's anxiety, which Jasmine declined. R. 359.

On May 28, Jasmine had a seizure while driving and was involved in a motor vehicle collision. R. 482. After the crash, EMS found that she "was initially altered" and transported her to the emergency room. R. 482. While in the ambulance, Jasmine "became more aroused." *Id.* At the emergency room, she did not remember the crash and had a mild headache. R. 482–83. On examination, she was alert and oriented times three and had grossly intact strength and sensation throughout. R. 485. She was still taking Topamax and had not missed any doses, but was supposed to be tapering to Oxtellar and had not done so because she could not afford that medication. R. 489, 497. Thus, the providers noted that Jasmine "had not been taking her medication as prescribed[,] which [wa]s likely what led to her seizure activity." R. 489. A CT scan of Jasmine's head showed "[s]table left temporal encephalomalacia and volume loss" in her brain and no evidence of acute intracranial abnormality. R. 495, 550–51. A CT scan of Jasmine's

chest showed that she had fractured her acromion. R. 494–95. Although providers recommended

that Jasmine stay overnight for observation, Jasmine left against medical advice. R. 500. On

discharge, providers emphasized that Jasmine should not be allowed to drive for at least six

months. R. 499.

In June, Jasmine told Dr. Hooks that she was still having seizures and was missing doses

of her anti-epileptic medication because of its side effects. R. 481. Jasmine was still taking

Topamax rather than Oxtellar because the Oxtellar prescription was too expensive. R. 478. Dr.

Hooks noted that Jasmine had reported "decreased cognitive processing and mood fluctuations"

and that such changes can be a side effect of Topamax. R. 478–79. She switched Jasmine's anti-

epileptic medication to Lamictal, which Jasmine could afford. *Id.* At Jasmine's request, Dr.

Hooks referred her to a new neurologist. R. 481.

On June 28, Jasmine visited neurologist Derek Pyland, M.D., for her epilepsy. R. 473.

Jasmine was alert and oriented times three, and she had intact attention; 2/3 memory at five

minutes' recall; normal muscle bulk and tone; 5/5 strength throughout; normal gait; and intact

comprehension, naming, and repetition. R. 475–76. She had started taking Lamictal and stopped

taking Topamax. R. 474. Jasmine reported that she had stopped driving and that her anxiety had

improved in the last month. *Id.* She "[wa]s off Celexa and ran out of" Hydroxyzine. *Id.* Dr.

Pyland increased her Lamictal dose and reminded her not to drive until November 2020. R. 476.

On October 10, Jasmine went to the emergency room for a seizure and a bitemporal

headache. R. 603. She reported that bitemporal headaches were not unusual for her and that her

last known seizure was in May 2020. *Id.* On examination, she was drowsy, responsive to voice

commands, and alert and oriented times three. R. 604. At Jasmine's request, providers allowed

her to leave and follow up with her neurologist. R. 605. Jasmine saw neurologist Nathaniel

9

Beachy, M.D., on February 2, 2021. R. 641. At that appointment, she was alert and oriented

times three, and she had intact attention to conversation, normal gait, and intact comprehension.

R. 644. Jasmine had tried to increase her Lamictal dose to 75mg as Dr. Pyland had instructed,

but she "reduced back to 50 mg" and could not "recall why." R. 641. She thought that she might

have done so because on the increased Lamictal dose, "she might have had a reduced appetite."

*Id.* Dr. Beachy noted that Jasmine's epilepsy was "poorly controlled on a subtherapeutic dose" of

Lamictal. R. 644. He recommended that Jasmine increase her dose, but she declined to do so. *Id.*

Jasmine reported that she had been driving again. R. 642. Dr. Beachy told Jasmine that she

should not drive until she was seizure-free for at least six months "on a stable and adequate dose

of an appropriate antiseizure medication." R. 644. Because Jasmine continued to drive while

being "at high risk for a breakthrough seizure," Dr. Beachy faxed a medical review request to the

Virginia Department of Motor Vehicles. *Id.*

        In February 2021, DDS referred Jasmine to Joseph Cianciolo, Ph.D., for a psychological

assessment as part of her disability applications. R. 676. At the appointment on February 24, Dr.

Cianciolo conducted a mental status examination. He observed that Jasmine was alert and fully

oriented, and she had normal gait and posture, anxious mood, constricted affect, logical and goal

directed plans, and adequately developed insight and judgment. R. 676–77. Dr. Cianciolo noted

that she took lengthy pauses when responding to his questions. R. 677. He also evaluated

Jasmine using the Wechsler Adult Intelligence Scale ("WAIS") and the Wechsler Memory Scale

("WMS"). *Id.* On the WAIS, Jasmine obtained an IQ score of 67, which "falls within the mildly

intellectually disabled range." *Id.* On the WMS, Jasmine obtained results that were "somewhat

higher than those anticipated based on her performance on the [WAIS]," but she still had deficits

"in all areas assessed consistent with [her] current complaint" that she had cognitive

impairments. *See id.* Jasmine gave her best effort, "work[ing] extremely slowly but diligently at all presented tasks." *Id.* Presenting the test materials to Jasmine multiple times "did little to enhance retention and recall," and allowing time to pass and introducing extraneous variables "further degraded retention and recall." *Id.* Dr. Cianciolo noted that Jasmine's scores were "markedly below what one would anticipate her premorbid functioning to have been given her" educational and occupational histories. *Id.*

On April 5, Jasmine established care with a new primary care provider. R. 732. On examination, Jasmine was alert and oriented, and she had normal motor strength, normal gait, intact cognitive function, good judgment and insight, and full range of mood and affect. R. 734. The provider assessed Jasmine with intractable epilepsy[4] without status epilepticus, anxiety, depression, and "other chronic pain." *Id.* The provider refilled Jasmine's Lamictal and Hydroxyzine prescriptions. R. 735.

On April 16, Jasmine saw Dr. Pyland with chief complaints of seizures and dizziness. R. 685. On examination, she was alert and oriented times three, and she had 5/5 strength throughout, normal muscle bulk and tone, intact attention to conversation, but slower than expected gait for her age. R. 688. Jasmine reported that she took 50mg of Lamictal twice a day and had not had any seizures since October 2020. R. 686. Dr. Pyland noted Jasmine may need to increase Lamictal if she had more seizures, and he reduced her Zanaflex "to improve hydration and to help dizziness." R. 688–89.

On May 11, Jasmine saw her primary care provider for worsening depression and anxiety. R. 723–24. On examination, Jasmine was alert and oriented, and she had normal gait, normal motor strength, intact cognitive function, good judgment and insight, and depressed

---

[4] "Intractable" means "resistant to cure, relief, or control." *Intractable*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

mood. R. 726. The provider assessed Jasmine with depression, mixed anxiety depressive

disorder, and intractable epilepsy without status epilepticus. *Id.* The provider prescribed

Sertraline for Jasmine's depression and continued her Hydroxyzine and Lamictal prescriptions.

*Id.* Jasmine followed up with her primary care provider on June 22. R. 720. Jasmine had full

range of mood and affect, but exam findings were otherwise unchanged. *See* R. 721. She

reported that she felt much better, her mood was stable, and she had no anxiety. *Id.* The provider

continued Jasmine's prescriptions for Sertraline, Hydroxyzine, and Lamictal. *Id.*

On June 29, Jasmine saw her primary care provider for a headache that made her feel like

"her head was on fire," made her nauseous, and caused "vision changes with double vision" and

light sensitivity. R. 717. Jasmine had depressed mood, but exam findings were still otherwise

unchanged. *See* R. 718. The provider assessed Jasmine with migraine with aura and mixed

anxiety depressive disorder and prescribed Sumatriptan and Ondansetron for Jasmine's

migraines. *Id.*

On July 21, Jasmine saw Stephanie Gillan, N.P., at the neurology clinic. Jasmine reported

that she had not had any "known witnessed seizures since October 2020," but for the last month,

she had been waking up with a sore tongue "a couple of times per week," which also happened

in 2019 before her first witnessed seizure. R. 751–52. Jasmine reported that a friend saw her

jerking in her sleep, but when she woke up, "she felt normal[,] was able to communicate . . . . [,

and] did not feel as if she had a seizure." R. 752. Jasmine had not had a headache since June, and

her anxiety was well-managed with Sertraline. *Id.* She "report[ed] no concern with dizziness." R.

757. On examination, she was alert and oriented and had no abnormality of orientation, fund of

knowledge, attention, concentration, memory, speech, language, or executive function. R. 754.

The neurologist increased Jasmine's dose of Lamictal. R. 755.

Jasmine followed up with her primary care provider on August 5. R. 834. Jasmine

reported that Sertraline and Hydroxyzine controlled her depression and anxiety well, her

treatment regimen controlled her headaches well, and the increased dose of Lamictal made her

tired. *Id.* On examination, she was alert and oriented and had normal motor strength, intact

cognitive function, good judgment and insight, and depressed mood. R. 835. The provider

assessed Jasmine with migraine with aura and without status migrainosus, mixed anxiety

depressive disorder, and intractable epilepsy without status epilepticus. *Id.* The provider

continued Jasmine's Ondansetron, Sumatriptan, Hydroxyzine, Sertraline, and Lamictal

prescriptions. R. 836.

2.    *Medical Opinions*

On February 24, 2021, based on his psychological assessment of Jasmine, Dr. Cianciolo

opined that Jasmine had "the intellectual capability necessary to perform simple and repetitive

tasks in relatively unimpaired fashion," but that her "ability to perform detailed and complex

tasks" was "severely impaired." R. 677. Her "ability to maintain regular attendance in the

workplace, perform work activities on a consistent basis, and complet[e] a normal workday or

work week without interruption from psychiatric condition" was "moderately impaired." *Id.*

Given her cognitive functioning, she would require additional supervision in the workplace, and

she could accept "concrete instruction from supervisors." R. 677–78. Her ability to interact with

coworkers and deal with routine work stressors was also "moderately impaired." R. 678.

On April 16, 2021, Dr. Pyland completed a physical impairment questionnaire. R. 705–

07. Dr. Pyland identified Jasmine's diagnoses as "localization related symptomatic epilepsy,

subarachnoid hemorrhage" and her symptoms as seizures, dizziness, diffuse body pain, anxiety,

and concentration problems. R. 705. Her side effects from Lamictal included dizziness and

drowsiness. *Id.* Her symptoms were "frequently" severe enough to interfere with the attention
and concentration needed to perform simple  work-related tasks. *Id.* During an eight-hour
workday, Jasmine would need to recline or lie down in excess of the typically allotted breaks of
fifteen minutes in the morning, 30 to 60 minutes at lunch, and fifteen minutes in the afternoon.
*Id.* She could walk four blocks without rest or significant pain; sit for sixty minutes at a time;
stand or walk for ten minutes at a time; sit for six hours of an eight-hour workday; stand or walk
for one hour of an eight-hour workday; lift fewer than ten pounds frequently; lift ten pounds
occasionally; never lift twenty pounds or more; grasp, twist, or turn objects for ten percent of an
eight-hour workday; do fine manipulation for ten percent of an eight-hour workday; and reach
for twenty percent of an eight-hour workday. R. 705–06. Jasmine would need a job that would
allow her to shift positions at will and to take three or four ten-minute-long unscheduled breaks
during an eight-hour workday. R. 705. She would need to miss work once or twice a month
because of her impairments, and she was not physically capable of working eight-hour days five
days a week on a sustained basis. R. 706.

Richard Surrusco, M.D., reviewed Jasmine's medical records to determine Jasmine's
physical RFC for DDS's initial review in March 2021. R. 81–84. Dr. Surrusco opined that
Jasmine was unlimited in her ability to "[p]ush and/or pull" and had exertional limitations of
occasionally lifting and/or carrying twenty pounds, frequently lifting and/or carrying ten pounds,
standing and/or waking "with normal breaks" for "[a]bout 6 hours in an 8-hour workday," and
sitting "with normal breaks" for "[m]ore than 6 hours on a sustained basis in an 8-hour workday"
because she has "seizures" and no "gait, strength, sensory" issues. R. 82. Jasmine had postural
limitations of never climbing ladders, ropes, or scaffolds and frequently climbing ramps or stairs,
balancing, stooping, kneeling, crouching, and crawling because she has seizures, a subarachnoid

14

hemorrhage, and no "gait, strength, sensory" issues. R. 83. She had no manipulative, visual, or communicative limitations. *Id.* She could have unlimited exposure to extreme cold and heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation, but she needed to "[a]void even moderate exposure to hazards" because of her seizures and subarachnoid hemorrhage. R. 84.

Howard S. Leizer, Ph.D., reviewed Jasmine's records to determine Jasmine's mental RFC for DDS's initial level review in March 2021. R. 85–88. Dr. Leizer opined that Jasmine was "[n]ot significantly limited" in her abilities to "remember locations and work-like procedures" and "understand and remember detailed instructions," but she was "[m]oderately limited" in her "ability to understand and remember detailed instructions." R. 85. More specifically, Dr. Leizer concluded that Jasmine was "capable of frequent[ly] recalling simple instructions." *Id.* Jasmine had "sustained concentration and persistence limitations." *Id.* She was "[n]ot significantly limited" in her abilities to "carry out very short and simple instructions" and "make simple work-related decisions," and she was "[m]oderately limited" in her abilities to "carry out detailed instructions"; "maintain attention and concentration for extended periods"; "perform tasks within a schedule, maintain regular attendants, and be punctual within customary tolerances"; "sustain an ordinary routine without special supervision"; "work in coordination with or in proximity to others without being distracted by them"; and "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." R. 86. Nonetheless, Dr. Leizer concluded that Jasmine was "capable of persistence, pace, [and] concentration for simple repetitive tasks frequently." R. 87. She also had social interaction limitations. *Id.* She was "[n]ot significantly limited" in her abilities to "ask simple questions or request assistance" and

"maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness," and she was "[m]oderately limited" in her abilities to "interact appropriately with the general public," "accept instructions and respond appropriately to criticism from supervisors," and "get along with coworkers or peers without distracting them and exhibiting behavioral extremes." *Id.* More specifically, Dr. Leizer opined that Jasmine could "handle occasional interaction [with the] public and others." *Id.* Jasmine had adaptive limitations. R. 88. She was "[n]ot significantly limited" in her abilities to "be aware of normal hazards and take appropriate precautions," "travel in unfamiliar places or use public transportation," and "set realistic goals or make plans independently of others," and she was "[m]oderately limited" in her ability to "respond appropriately to changes in the work setting." *Id.* More specifically, Dr. Leizer opined that Jasmine could "handle progressive changes in the work setting." *Id.* He did not explain what he meant by "progressive" changes.

In April 2021, Stephen Saxby, Ph.D., reviewed Jasmine's records to determine her mental RFC for DDS's reconsideration level review and adopted the initial level mental RFC in its entirety. R. 102–103. In May 2021, Jack Hutcheson, Jr., M.D., did the same for Jasmine's physical RFC. R. 100–02. Dr. Hutcheson adopted the initial level physical RFC but determined that Jasmine should avoid concentrated exposure to hazards rather than avoiding even moderate exposure to hazards. *Id.*

    3.    *Jasmine's Testimony*

On October 1, 2021, Jasmine testified at the administrative hearing. R. 44–59. Jasmine had completed a high school education and attended college for three years, taking "regular classes, not special education." R. 45–46. Jasmine then worked as a corrections officer. R. 47.

She became unable to work on October 29, 2019, from epilepsy, depression, anxiety, migraines, and unspecified neurocognitive disorder. R. 44.

Since her onset date, Jasmine has seizures "all the time." R. 50. The seizures usually happen while Jasmine is asleep, and she knows about these seizures because her boyfriend sees them, and she has ongoing symptoms "all day" after nighttime seizures. R. 50–51. Jasmine has "some really bad [seizures] during the day" as well. R. 50. "[A]nything could cause" Jasmine to have a seizure, including lights, the television, and heights. R. 51–52. At the time of the hearing, it had been "a week or two" since she last had a seizure. R. 50. Jasmine also gets migraines, and her head hurts "every day." R. 55. "Anything can" trigger her migraines. *Id.*

Jasmine has difficulty remembering things. R. 51–52. As such, "[i]t's very, very difficult" for her to remember to take her medications and go to her doctors' appointments. R. 52. Someone must remind Jasmine to take her pills and use her pill case, *id.*, and she "need[s] help and reminders" to brush her teeth and hair, R. 53–54. When Jasmine does her hair, "it takes [her] forever," and she has "burnt [her] hair out." R. 54. "[B]ecause [Jasmine] do[es]n't remember," she needs "a lot" of help from her boyfriend and roommates to remember to pay her bills. *Id.* When she tries to follow a recipe, "[i]t might be missing something," and she has to set alarms "[f]or everything, even if it's five minutes" and must "make sure somebody's [t]here with [her]" because otherwise she will "catch the kitchen on fire." R. 54–55.

Jasmine has trouble with comprehension and concentration. R. 51–53. She cannot "stay focused on anything." R. 51. It takes her "two days to even try" watching a movie, and when the movie ends, she "still do[es]n't know what's just happened." R. 53. When Jasmine reads, she can follow the storyline and understand what she is reading only "[i]f she keeps reading it over and over and over" and "break[s] it down." *Id.*

Jasmine is "dizzy all the time." R. 51. She "can barely go up stairs or stand up for a long time." *Id.* After reading "one or two pages," she gets dizzy and has to stop even though she used to be able to "read a lot." R. 53. When Jasmine takes the bus, her dizziness makes it seem like she is "on a roller coaster." R. 57. She must "hold on and make sure [she] get[s] off the bus gently" because otherwise, her dizziness will make her fall. R. 57. Taking the bus "[i]s even worse at night," so Jasmine "tr[ies] not to go anywhere at night." *Id.* She also "see[s] double lights," which is worse at night. R. 58. Jasmine's medications sometimes make her sick and nauseous, and she feels "really" dizzy for thirty minutes to an hour after taking one of her medications. R. 56. As a result of her impairments, Jasmine cannot drive, but she still tries to do some basic activities. R. 57–58. Jasmine takes the bus to shop for groceries. R. 56–57. She finds this difficult because the bus makes her dizzy. R. 57. She also "do[es] some laundry, . . . [w]ash[es] some dishes, . . . [and] tr[ies] to keep the kitchen clean." *Id.* Although Jasmine cooks "easy stuff" for herself, "like a grilled cheese[] or some soup," she "do[es]n't really like spending too much time in the kitchen" because she often sets off the smoke alarm, has "sliced [her] fingers," burns herself, and sometimes has shaking in her hands. R. 57–58. To Jasmine, "[i]t seems" that she burns herself "every day." R. 58. On a typical day, she "might try to read a book on [her] laptop" or use colored pencils to draw in coloring books. R. 56. She might also "try to watch a movie, but [she] just look[s] at the TV" and is not "really . . . watching it." *Id.* "[U]sually," she tries to "just sleep and stay on a schedule." *Id.*

4.    *The VE's Testimony*

At the administrative hearing on October 1, 2021, the VE testified that jobs like maid, office helper, and non-government mail sorter "would require eight hours a day, five days a week or an equivalent work schedule." R. 62. Normally, these jobs allow for one fifteen-minute-

long break in the morning, one thirty- to sixty-minute-long break in the middle of the day, and

one fifteen-minute-long break in the afternoon. R. 62–63. These jobs have "off-task tolerance" of

"[n]o greater than 15%," do not tolerate additional or unscheduled breaks, and tolerate absences

once per month at most. R. 63. If a person needed additional breaks, absences, or off-task time,

that person would not be able to "keep any of the sample jobs without being fired." *Id.* If a

person had seizures in the workplace that were apparent to others, even if she did not lose

consciousness, that would not be "compatible with a competitive work setting." *Id.*

B.    *The ALJ's Decision*

ALJ Rippel summarized the evidence from the record, R. 22–29, including Jasmine's

testimony at the administrative hearing, R. 23, and some of the objective medical evidence from

Jasmine's treatment records, R. 23–27. He found that Jasmine's migraine headaches, epilepsy,

depressive disorder, anxiety disorder, and neurocognitive disorder were all "severe" MDIs, R.

20, but that none met or medically equaled (alone to combined) the relevant Listings, R. 20–22.

ALJ Rippel found that Jasmine's MDIs "could reasonably be expected to cause [Jasmine's]

alleged symptoms," but that her "statements concerning the intensity, persistence[,] and limiting

effects of these symptoms [we]re not entirely consistent with the medical evidence and other

evidence in the record." R. 27. He reasoned that Jasmine's subjective statements were

"inconsistent" in part because "findings during diagnostic testing have not revealed listing level

results." *Id.*; *see* R. 20–22. He noted that the October 2019 CT scan showed a trace subarachnoid

hemorrhage on the left anterior frontal lobe, the May 2020 CT scan showed no evidence of acute

intracranial abnormality but also showed stable left temporal encephalomalacia and volume loss,

the MRI of Jasmine's brain showed subtle left frontal sulcal FLAIR hyperintensity that appeared

to correspond to the hyperdensity on the October 2019 CT scan as well as encephalomalacia and

gliosis suggestive of remote traumatic injury in the left temporal lobe, and the November 2019

EEG was normal. R. 27 (citing R. 382–83, 425–35, 439–41, 550–52). He further reasoned that

Jasmine's statements were inconsistent because "[f]indings during physical examinations have

been minimal," showing that she "was alert and oriented, with regular heart rate and rhythm,

lungs clear to auscultation, with normal strength, normal sensation, normal vision, . . . non-focal

neurological examinations[,] . . . with full fund of knowledge[,] intact attention[,]

comprehension, naming, and repetition intact." *Id.* (citing R. 357–58, 363, 368, 371, 373, 376,

381, 475–76, 644, 688, 692, 718, 721, 726, 729, 733–734, 754, 835, 841). ALJ Rippel explained

that Jasmine's statements were inconsistent because her treatment "has been routine,

conservative, and unremarkable." *Id.* Her migraines have been treated with Sumatriptan,

Ondansetron, and Zanaflex. *Id.* (citing R. 718, 836). Her epilepsy has been treated with Keppra,

Topamax, Oxtellar, and Lamictal. *Id.* (citing 358, 378, 476). Her mental impairments have been

treated with Hydroxyzine, Celexa, Sertraline, and referrals for counseling. *Id.* (citing R. 368,

373, 376, 723–27). Lastly, ALJ Rippel found that Jasmine had "provided inconsistent statements

regarding her limitations." *Id.* He noted that although Jasmine "testified that she is still having

seizure[s]," in April and July of 2021, she told her neurologist that her last seizure was October

2020 and "that she felt an observed episode of jerking while sleeping was not a seizure." *Id.*

(citing R. 751–56).

Then, ALJ Rippel evaluated the medical-opinion evidence in the record. R. 28–29. He

noted that Dr. Cianciolo found Jasmine could perform simple and repetitive tasks and she had

moderately impaired abilities to maintain regular attendance, perform work activities on a

consistent basis, and complete a normal workday or workweek. R. 28. He found that Dr.

Cianciolo's opinion was "partially persuasive" because it was "somewhat consistent with and

supported by the medical evidence of record regarding [Jasmine]'s ability to perform simple, routine tasks" as well as "the need for a low-stress work environment[] and only occasional social interactions." *Id.* However, Jasmine's medical record suggested "addition[al] limitations," including "limitations to entry-level unskilled work with instructions that are not involved; routine, customary breaks; and no fast-paced production rate at work" because of Jasmine's persistent depression. R. 28–29 (citing R. 835).

ALJ Rippel noted Dr. Pyland's opinions that Jasmine could lift and carry ten pounds occasionally and less than ten pounds frequently; stand or walk for one hour and sit for six hours in an eight-hour workday; and handle ten percent, grasp ten percent, and reach twenty percent of an eight-hour workday. R. 29. Additionally, Jasmine would need to recline or lie down more frequently than customarily allowed during a workday, she would require three to four ten-minute-long breaks in addition to the breaks customarily allowed during a workday, and she would be absent from work because of her symptoms or treatment one or two days a month. *Id.* The ALJ found that Dr. Pyland's opinion "ha[d] little persuasiveness" because it was "not consistent with or supported by the medical evidence of record, including Dr. Pyland's own findings in April 2021 that the claimant had normal muscle bulk and tone, 5/5 strength throughout, intact sens[ation] bilaterally in all four extremities to light touch, normal gait, calm, alert, and oriented times three, with intact attention, fluent speech, and intact comprehension." *Id.* (citing R. 688). ALJ Rippel explained that he accounted for those findings, in addition to Jasmine's intractable epilepsy, migraine with aura, and medications for both conditions, in his RFC determination.

ALJ Rippel found that the DDS physician's opinion was "partially persuasive." R. 28. The ALJ noted that due to her epilepsy and increased dose of Lamictal, Jasmine would need

additional "limitations to occasional climbing ramps and stairs, balancing, stooping, kneeling,

crouching, crawling; and no operation of motor vehicles and similar equipment." *Id.* (citing R.

835). Because of her migraines, she would need "a limitation to a moderate noise environment."

*Id.* (citing R. 836). Similarly, ALJ Rippel found the DDS psychologist's opinion "partially

persuasive" but determined that due to her "depressed mood despite the prescription of Zoloft

and [Hydroxyzine]," Jasmine would need additional "limitations to entry-level unskilled work

with instructions that are not involved; routine, customary breaks; no fast-paced production rate

work; and low-stress work." *Id.* (citing R. 835).

C.    *Discussion*

        Jasmine challenges ALJ Rippel's RFC finding on the ground that it was not supported by

substantial evidence because he did not properly evaluate Dr. Pyland's medical opinion,

particularly as to Jasmine's need for breaks and absenteeism. Pl.'s Br. 9, 12–15. Specifically,

Jasmine argues that the ALJ's supportability analysis was improper because he relied "on an

overly selective reading of a single treatment note to reject" Dr. Pyland's opinion. *Id.* at 12–13.

She argues that the ALJ's consistency analysis was improper because he "made findings

regarding continued diagnose[s] of intractable epilepsy and migraines, as well as continued

medication treatment," but he "ma[de] no mention of any diagnostic or objective findings

revealed throughout the record." *Id.* at 13. Moreover, Jasmine asserts that "the record is highly

consistent with Dr. Pyland's opined limitations." *Id.* (citing R. 28, 354, 355, 358, 677).

        A claimant's RFC is her "maximum remaining ability to do sustained work activities in

an ordinary work setting" for eight hours a day, five days a week despite her medical

impairments and symptoms. SSR 96-8p, 1996 WL 374194, at *2 (July 2, 1996) (emphasis

omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case

record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities" on that basis, SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015). Generally, a reviewing court will affirm the ALJ's RFC findings when it is clear he considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.,* 873 F.3d 251, 268–72 (4th Cir. 2017), and his written decision builds an "accurate and logical bridge from that evidence to his conclusion," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (cleaned up).

"Medical opinions"—i.e., "statement[s] from a medical source about what [the claimant] can still do despite" her MDIs and whether the claimant has "impairment-related limitations or restrictions" in meeting specific physical, mental, or environmental demands of work, 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2), can be critical to a proper RFC analysis. *See, e.g.*, *Oakes v. Kijikazi*, 70 F.4th 207, 212–15 (4th Cir. 2023); *Woods*, 888 F.3d at 695. The regulations specify "how [ALJs] consider medical opinions" as part of their disability determinations and "how [ALJs] articulate" certain findings in their written decisions. 20 C.F.R. §§ 404.1520c, 416.920c (claims filed on or after March 27, 2017). First, ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" in the claimant's record. *Id.* §§ 404.1520c(a), 416.920c(a). Instead, ALJs "will consider [all] medical opinions . . . using the factors listed in [subparagraphs] (c)(1) through (c)(5) . . . , as appropriate." *Id.*; *see Oakes*, 70 F.4th at 212. Second, ALJs "will articulate . . . how persuasive [they] find all of the medical opinions" in the claimant's record. 20 C.F.R. §§ 404.1520c(b), 416.920c(b). These "articulation requirements" in turn instruct ALJs to "articulate how [they] considered the medical

opinions from [each] medical source" on a source-by-source basis. *Id.* §§ 404.1520c(b)(1),

416.920c(b)(1). They "are not required to articulate how [they] considered each medical opinion

. . . from one medical source individually." *Id.* ALJs should "articulate how [they] considered the

medical opinions . . . from [each] medical source together in a single analysis using the factors

listed in [subparagraphs] (c)(1) through (c)(5) . . . , as appropriate." *Id.* These "persuasiveness"

factors include: "(1) supportability; (2) consistency; (3) a physician's relationship with the

claimant; (4) a physician's specialization; and (5) other factors, like the physician's familiarity

with the evidentiary record." *See Oakes*, 70 F.4th at 212 (citing 20 C.F.R. § 404.1520c(1)–(5)).

The first two factors—supportability and consistency—"are the most important factors

[ALJs] consider when [they] determine how persuasive [they] find a source's medical opinions .

. . to be. Therefore, [ALJs] will explain how [they] considered the supportability and consistency

factors for [each] medical source's medical opinions." 20 C.F.R. §§ 404.1520c(b)(2),

416.920c(b)(2). Supportability and consistency are distinct legal concepts under the regulations.

*Id.* §§ 404.1520c(b)(2)–(c)(2), 416.920c(b)(2)–(c)(2); *Oakes*, 70 F.4th at 212. "Supportability"

requires ALJs to consider "the objective medical evidence and . . . explanations *presented by*

[the] medical source . . . to support his or her [own] medical opinion(s)." 20 C.F.R. §§

404.1520c(c)(1), 416.920c(c)(1) (emphasis added). *See Oakes*, 70 F.4th at 212. "Consistency"

requires ALJs to compare that source's medical opinions to "evidence *from other* medical and

nonmedical sources" in the claimant's record. 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2)

(emphasis added). *See Oakes*, 70 F.4th at 212. Thus, ALJs must explain how they considered

*both* supportability *and* consistency for each source's medical opinion. 20 C.F.R. §§

404.1520c(b)(2), 416.920c(b)(2). They "may, but are not required to, explain how [they]

considered the [other] factors" in determining how persuasive the source's medical opinions are to the disability determination. *Id.*

As always, the ALJ's decision must build an accurate and "logical bridge between the evidence and the ALJ's conclusion that [a medical] opinion," *Oakes*, 70 F.4th at 214, is or is not "persuasive" evidence of the claimant's allegedly disabling medical condition, *see id.* at 212–13. When the court is "'left to guess' as to how the ALJ reached her evaluation of the conflicting medical opinions in light of the evidence of record," then it cannot "review the reasonableness of her conclusions." *Testamark v. Berryhill*, 736 F. App'x 395, 398 (4th Cir. 2018) (quoting *Mascio*, 780 F.3d at 638), to ensure that "the ALJ's decision is supported as a matter of fact and law," *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). This regulation is more flexible than its predecessor, which required ALJs to evaluate "treating source" medical opinions under a special two-part standard and to explicitly consider each of five regulatory factors when assigning specific weights to every medical opinion in the claimant's record. *See, e.g.*, *Dowling v. Comm'r of Soc. Sec.*, 986 F.3d 377, 384–85 (4th Cir. 2021) (citing 20 C.F.R. § 404.1527(c) (2016)).

ALJ Rippel's analysis does not satisfy "this deferential standard" of review. *Arakas v. Comm'r of Soc. Sec. Admin*, 983 F.3d 83, 95 (4th Cir. 2020). On the consistency factor, "[t]he more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). ALJ Rippel found that Dr. Pyland's opinion was "not consistent with . . . the medical evidence of record, including Dr. Pyland's own findings in April 2021 that [Jasmine] had normal muscle bulk and tone, 5/5 strength throughout, intact sens[ation] bilaterally in all four extremities to light tough, normal gait, calm, alert and oriented times three,

25

with intact attention, fluent speech, and intact comprehension." R. 29 (citing R. 688). The ALJ also related Jasmine's impairments to some environmental limitations. *Id.* Although the ALJ's explanation of how these findings relate to the particular limitations that he assessed could be more fulsome, those findings nonetheless logically relate to the limitations. However, ALJ Rippel did not explain how this evidence, or any other relevant evidence in Jasmine's record, was "not consistent with" Dr. Pyland's opinion that Jasmine would need unscheduled breaks during an eight-hour workday and need to "be absent from work . . . [o]nce or twice a month" because of her impairments. R. 705–06. That deficiency in the ALJ's analysis repeats an error he committed in assessing Dr. Cianciolo's opinion. Dr. Cianciolo opined that Jasmine's "ability to maintain regular attendance in the workplace, perform work activities on a consistent basis, and complet[e] a normal workday or work week without interruption from psychiatric condition" is "moderately impaired." R. 677. This opinion is at least partially consistent with Dr. Pyland's findings that Jasmine would be absent and require breaks in excess of those customarily allowed. *See Maggard v. Colvin*, No. 2:14cv41, 2016 WL 755650, at *7, *9 (W.D. Va. Feb. 25, 2016) (an ALJ reasonably accommodated medical opinions that the plaintiff was moderately limited in her ability to "maintain regular attendance" and "complete a normal workday or workweek without interruptions from psychologically based symptoms" by including ten-percent off-task tolerance in the plaintiff's RFC). ALJ Rippel acknowledged Dr. Cianciolo's findings, but he did not explain whether he found them consistent with Dr. Pyland's findings. The extent of the ALJ's analysis was noting that Jasmine's depression and antidepressants showed that she needed a limitation to "routine, customary breaks," but he did not explain why that limitation adequately accounted for Jasmine's limitations caused by her impairments and medication side effects. This

lack of explanation leaves the Court to guess how the ALJ evaluated Dr. Pyland's opinions about Jasmine's expected absenteeism and need for breaks.

The supportability factor examines the "objective medical evidence and supporting explanations presented by a medical source . . . to support his or her [own] medical opinion[]." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The "more relevant" the evidence and explanations a medical source presents "to support his or her medical opinion[]" are, "the more persuasive" that opinion will be. *See id.* ALJ Rippel mentioned this factor, stating that Dr. Pyland's opinion was "not . . . supported by the medical evidence of record, including Dr. Pyland's own findings in April 2021 that the claimant had normal muscle bulk and tone, 5/5 strength throughout, intact sens[ation] bilaterally in all four extremities to light touch, normal gait, calm, alert and oriented times three, with intact attention, fluent speech, and intact comprehension." R. 29. The ALJ's characterization of Dr. Pyland's April 2021 findings is largely accurate, but this is just one treatment note. The record contains other, conflicting evidence of Jasmine's signs, symptoms, and medication side effects, including Dr. Pyland's other treatment notes. Dr. Pyland referred to Jasmine's symptoms and medication side effects in his opinion, albeit briefly. *See* R. 705. The ALJ, however, did not discuss this mixed evidence in assessing supportability. He did not note Dr. Pyland's finding that Jasmine had 2/3 memory at five minutes' recall. R. 487. He did not discuss the findings on the October 2019 MRI showing encephalomalacia and gliosis, R. 425, the CT scan in May 2020 showing "stable left temporal encephalomalacia and volume loss," R. 550–51, or Jasmine's primary care provider's assessment that Jasmine has intractable epilepsy, R. 734.

"An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a

disability finding." *Lewis*, 858 F.3d at 869. Because ALJ Rippel discussed only "facts that support a finding of nondisability while ignoring evidence that pointed to a disability finding" when he assessed the persuasiveness of Dr. Pyland's opinion, ALJ Rippel's analysis was insufficient. *See Lewis*, 858 F.3d at 869–70.

Because ALJ Rippel did not sufficiently explain how Dr. Pyland's opinion was inconsistent and unsupported, the ALJ's assessment of Dr. Pyland's opinion and, thus, the ALJ's RFC determination were not supported by substantial evidence.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** the Commissioner's motion for summary judgment, ECF No. 21, **REVERSE** the Commissioner's final decision denying Jasmine's DIB and SSI claims, and **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g).

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall serve certified copies of this Report and Recommendation on all counsel of record.

ENTER: December 21, 2023

Joel C. Hoppe
United States Magistrate Judge